ISLAND TOBACCO CO., LTD., Plaintiff,

v.

R. J. REYNOLDS INDUSTRIES, INC., R. J. Reynolds Tobacco Co., R. J. Reynolds Tobacco Co. (Hawaii), Defendants.

Civ. No. 78–0088.

United States District Court, D. Hawaii.

April 21, 1981.
As Amended Aug. 25, 1981.

728

R. Patrick Jaress, Susan M. Ichinose, Ann L. Kurihara, Mukai, Ichiki, Raffetto & Macmillan, Honolulu, Hawaii, for plaintiff.

Vernon F. L. Char, Michael K. Kawahara, Damon, Key, Char & Bocken, Honolulu, Hawaii, Max H. Crohn, Jr., Winston-Salem, N. C., Harold R. Schmidt, Rose, Schmidt, Dixon, Halsey, Whyte & Hardesty, Pittsburgh, Pa., for defendants.

## ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ALSO DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SAMUEL P. KING, Chief Judge.

I.  Factual Background

Plaintiff, Island Tobacco Co., Ltd., has brought this suit against Defendants R.J. Reynolds Industries, Inc., R.J. Reynolds Tobacco Co., and R.J. Reynolds Tobacco Co. (Hawaii) claiming violations of federal and state antitrust laws.

Island Tobacco Co., Ltd. ("Island Tobacco") is a Hawaii corporation with its principal place of business in Honolulu, Hawaii. Island Tobacco sells cigarettes and tobacco products as a wholesaler and more specifically as a service jobber.  A service jobber is distinguished from other types of tobacco wholesalers by the fact that it makes store-door deliveries to independent retailers. The company purchases approximately 80 brands of cigarettes from six major cigarette manufacturing companies [1] and delivers these cigarettes to 500–600 individual retailer accounts such as grocery stores, restaurants, and supermarkets in Oahu, Ha-

---

1.  The other five cigarette manufacturing companies are: American Tobacco Co., Brown & Williamson Tobacco Co., Liggett & Meyers, P. Lorillard & Co., and Phillip Morris.

waii. Island Tobacco also sells and distributes other products such as cigars, pipe tobacco, chewing tobacco, lighters, pipes and pipe cleaners, and candy, but at all times relevant to this action the bulk of Island Tobacco's business was the sale of cigarettes. Island Tobacco has been in the cigarette service jobbing business for approximately 28 years. Prior to January 1975, it was the only such service jobber in Hawaii.

Island Tobacco is owned by Harold T. Okimoto, who is the sole stockholder, president and overall financial manager of the company. Harold's brother, Thomas Okimoto, is vice-president and general manager and is responsible for the day-to-day business operations.

Defendant R.J. Reynolds Industries, Inc. ("RJR Industries") is a Delaware corporation with its principal place of business in Winston-Salem, North Carolina. RJR Industries was incorporated in 1970, and is a holding company for a number of subsidiaries including R.J. Reynolds Tobacco Co.

R.J. Reynolds Tobacco Co. ("RJR Tobacco") is a New Jersey corporation with its principal place of business in Winston-Salem, North Carolina. RJR Tobacco is a wholly-owned subsidiary of RJR Industries. RJR Tobacco is one of the six major cigarette manufacturers in the United States. In 1974, RJR Tobacco enjoyed approximately a 33⅓ percent share of the national market for tobacco products. RJR Tobacco is presently the largest tobacco manufacturer in the United States; it sells about one-third of all the cigarettes sold in the United States.

R.J. Reynolds Tobacco Co. (Hawaii) ("RJR Hawaii") is a Delaware corporation with its principal place of business in Hawaii. RJR Hawaii is a wholly-owned subsidiary of RJR Tobacco. It was incorporated on January 9, 1975, and was registered to do business in the State of Hawaii on January 14, 1975. RJR Hawaii functions as a service jobber and is operationally very similar to Island Tobacco except for the

fact that RJR Hawaii sells only RJR Tobacco's products. RJR Hawaii sells its products only in the State of Hawaii.

Prior to January 1975, RJR Tobacco had been selling its products to Island Tobacco and other "direct accounts" through an unincorporated division. In December 1973, RJR Tobacco terminated Island Tobacco's credit, and placed it on an "all cash" basis. Due to what it saw as distribution problems with Island Tobacco, RJR had decided as early as November 1974 to set up its own distribution system in Hawaii.

The new direct distribution system, which became operational on January 20, 1975, required RJR Hawaii to solicit retail customers and to call on each retail outlet at least once weekly at which time cigarettes and other items were sold to the retailer directly from a company truck.[2] RJR Tobacco normally distributes its products through independent wholesalers and service jobbers. Prior to the set-up of the Hawaii operation, the only other area where RJR Hawaii had initiated an inhouse wholesale operation was in Puerto Rico.

Part of the agreement in setting up RJR Hawaii required that a "transfer price" be fixed for products sold by RJR Tobacco to RJR Hawaii. In addition, the agreement provided that RJR Tobacco would reimburse RJR Hawaii for all expenses such as warehousing, distribution, and selling.

Plaintiff claims that the "transfer price" is discriminatory under section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(a)–(f) (1970). Plaintiff also claims that the "low" transfer price together with the cost reimbursement agreement have allowed Defendants to set their prices at predatory below cost rates in violation of Hawaii Rev.Stat. § 480–2.

Plaintiff also alleges in its complaint that Defendants have violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Appended to Plaintiff's complaint are state claims for violations of Hawaii Rev.Stat. § 480–4 (conspiracy in restraint of trade),

---

2. Island Tobacco's system of distribution differs slightly from RJR Hawaii's in that Island Tobacco takes orders for cigarettes on one day and delivers them on another.

and Hawaii Rev.Stat. § 480–9 (monopolization and attempt to monopolize).

Plaintiff's complaint is set forth in four counts:

(1) Count I alleges below cost pricing in violation of Hawaii Rev.Stat. § 481–3 and the Robinson-Patman Act, 15 U.S.C. § 13.

(2) Count II alleges a conspiracy to fix prices and restrain trade and a conspiracy to monopolize in the State of Hawaii in violation of the Sherman Act, 15 U.S.C. § 1 and Hawaii Rev. Stat. §§ 480–4 and 480–9.

(3) Count III alleges monopolization and an attempt to monopolize in violation of the Sherman Act, 15 U.S.C. § 2 and Hawaii Rev.Stat. § 480–9.

(4) Count IV alleges discriminatory pricing with the intent to destroy competition in violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13 and Hawaii Rev.Stat. § 481–1.

Defendants have moved for Summary Judgment on each of these four counts.

II. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves this Court for Partial Summary Judgment pursuant to Rules 56(a) and 56(d) Fed.R.Civ.P. on the following issues:

1. The "transfer price" is discriminatory within the meaning of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act; and

2. The "transfer price" that Defendant RJR Tobacco charges its Hawaii service jobber, RJR Hawaii, is predatory in nature and an unfair method of competition in violation of Hawaii Rev.Stat. § 480–2.

The facts underlying this Motion for Summary Judgment are not in dispute. After RJR Hawaii became operational on January 20, 1975, the parent company, which had previously been doing business with Island Tobacco through an unincorporated division, stopped selling cigarettes to Island Tobacco and other "direct" accounts and began selling solely to RJR Hawaii. RJR Hawaii then took over the operations of the unincorporated division and began selling cigarettes to these "direct" accounts which included large volume purchasers such as drug stores, food chains, and wholesalers. As part of the new direct distribution system, RJR Hawaii began soliciting and selling to 500–600 retail accounts, many of which were also accounts of Island Tobacco.

RJR Hawaii began its business in Hawaii with an offer to sell cigarettes to retail customers at "attractive" prices. Immediately prior to RJR Hawaii becoming operational, RJR Tobacco was selling its king size and regular cigarettes to "direct" accounts for $2.33 per carton. As of January 20, 1975, RJR Tobacco stopped selling cigarettes to these "direct" accounts and began selling to RJR Hawaii for $2.33 per carton. RJR Hawaii resold these cigarettes for the same $2.33 per carton to the former "direct" accounts of RJR Tobacco. After January 20, 1975, RJR Hawaii sold cigarettes to its retail accounts for $2.36 per carton, a three-cents mark-up as fixed by RJR Tobacco.

Prior to RJR Hawaii becoming operational in January 1975, Plaintiff purchased its cigarettes through RJR Tobacco's unincorporated division for $2.33 per carton. After January 20, 1975, Plaintiff was forced to purchase its cigarettes from RJR Hawaii for $2.33 per carton. Plaintiff claims that it has been unable to compete with the low "attractive" price of $2.36 offered by RJR Hawaii to its retail customers. In 1969, approximately 20 percent of Island Tobacco's business involved the sale of RJR Tobacco's cigarettes. Plaintiff claims to have lost approximately 95 percent of this business since RJR Hawaii's prices went into effect.

RJR Tobacco and RJR Hawaii entered into a "cost compensation" agreement which was memorialized in a July 15, 1975, writing. Paragraph 4 of that contract states in pertinent part that "RJR [Tobacco] will pay [RJR] Hawaii for the services listed in paragraphs 1 and 2, above, an

amount which, since January 14, 1975, have [sic] equalled, and hereinafter may continue to equal, the costs incurred by [RJR] Hawaii in performing such services."[3]

In a companion case filed in state court, the Circuit Court of the First Circuit ruled that "because of these payments for its expenses associated with its service jobbing activities, R. J. Reynolds (Hawaii) has been able to continue its sales of tobacco products in the service jobber market at a 1% markup, which is below its fully allocated cost of doing business." *Island Tobacco Co., Ltd., v. R. J. Reynolds Tobacco Co.,* Civil No. 45386 (Cir.Ct. 1st Cir. June 28, 1977). The Hawaii state court found Defendants in violation of the state's proscription against "sales below costs" as stated in Hawaii Rev.Stat. § 481–3.[4] The state court also found that RJR Hawaii offered these "below cost" sales with the intent to destroy competition, and ordered that para-

graph 4 of the July 15, 1975, contract be struck from the agreement as null and void pursuant to Hawaii Rev.Stat. § 481–9.[5]

On May 2, 1977, as a result of the state court order, Defendant instituted a "transfer" price between RJR Tobacco and RJR Hawaii. According to Defendants this transfer price was established at amounts which were equal to the prices charged by RJR Hawaii prior to the state court ruling less the reimbursement sums which had been credited to RJR Hawaii.

As of January 1, 1977, prior to the state court's nullification of the cost compensation agreement, RJR Hawaii was purchasing tobacco products from RJR Tobacco at the following prices: kings and regular cigarettes, $2.61 per carton; super, $2.71; Macdonalds, $3.28.[6]

On May 2, 1977, RJR Tobacco began charging RJR Hawaii the following prices:

---

**3.** Paragraphs 1 and 2 state in full:

1. Hawaii will continue performing or cause to be performed for RJR in the State of Hawaii the following warehousing, sales, administrative and other services in connection with tobacco products manufactured or distributed by RJR:

(a) warehousing, and handling incident thereto;

(b) delivery to Hawaiian customers including retail and wholesale distributors, military and seastores;

(c) shipment from Oahu to other islands in the State of Hawaii;

(d) regular calls on all existing and potential customers in an effort to obtain orders;

(e) promotional work, including but not limited to the following: the erection of displays, the placement of point of sale material, the erection of merchandisers, the distribution of consumer offers, and the distribution of sample products;

(f) introduce new tobacco items;

(g) locate and pickup from distributors and retailers unsaleable merchandise and assist in destroying such merchandise following established governmental procedures;

(h) provide trucks and cars for sales personnel;

(i) provide an office, an administrative staff and any necessary equipment and supplies to perform such functions as accounting, billing, order taking, credit, personnel, and secretarial;

(j) provide necessary management for the warehousing, sales, and administrative services performed; and

(k) pay all applicable state and local fees and licenses.

2. In addition to the services enumerated in paragraph 1 above, Hawaii shall perform or cause to be performed such other services as may be reasonably requested from time to time by RJR.

**4.** Hawaii Rev.Stat. § 481–3 provides in pertinent part:

No person ... engaged in the business within the State shall sell, offer for sale, or advertise for sale any article, or product, or service or output of a service trade, at less than the cost thereof to such vendor ... with the intent to destroy competition....

The "cost of doing business" or "overhead expense" means all costs of doing business incurred in the conduct of the business and includes without limitation the following items of expense: labor (including salaries of executive officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance, and advertising.

**5.** Hawaii Rev.Stat. § 481–9 provides:

Any contract, express or implied, made by any person, firm, or corporation in violation of any of the provisions of sections 481–1 to 481–7 is declared to be an illegal contract and no recovery thereon shall be had.

**6.** "Macdonald" is a cigarette brand manufactured by RJR Macdonald Inc., a Canadian subsidiary of RJR Industries.

kings and regular, $2.35; super, $2.45; Macdonalds, $3.28.

On or about August 15, 1977, RJR Tobacco began charging RJR Hawaii the following prices: kings and regular, $2.51; super, $2.61; Macdonalds, $3.28.

■ Defendants admit that the prices of May 2 and August 15, 1977, are lower than those charged by RJR Tobacco to its wholesalers, service jobbers, and distributors elsewhere in the United States.[7]

### A. Robinson-Patman Price Discrimination

■ Section 2(a) of the Clayton Act forbids any person from selling goods of like grade and quality in commerce to different purchasers at different prices where the effect is anticompetitive.[8] A section 2(a) violation will not be found unless one seller is responsible for making sales to two or more different purchasers.[9] There are two components of this violation which under the facts of this case are crucial to this Court's price discrimination analysis. The first is whether an intra-enterprise transfer of goods between a parent and its subsidi-

ary constitutes a "sale" within the meaning of the Act. The intra-enterprise transfer issue is to be distinguished from the question of whether a sale by a parent and a sale by its subsidiary at different prices are sales made by the same "person."

### 1. Intra-enterprise transfers

The jurisdictional reach of section 2(a) of the Clayton Act has been held limited to discriminations in price that occur when commodities are "sold." In determining whether a transaction is a sale, courts have followed the rule that there must be an actual and complete sale.[10] Although the term "sale" is not defined in the Act, the traditional concepts of arm's length bargaining, dominion, and control have been generally accepted. Nevertheless, the development of vertically integrated companies and the growth of independent profit centers has raised anew the Act's applicability to intra-enterprise transfers.

The most recent rule enunciated by this circuit appears in *Brown v. Hansen Publications, Inc.*, 556 F.2d 969 (9th Cir. 1977), wherein the Ninth Circuit affirmed a dis-

---

**7.** Defendants' answer to paragraph 43 of Plaintiff's Complaint. Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, explicitly deals with geographical price discrimination. A private cause of action, however, will not lie for violations of this section. *See Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 854 n.5 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *See also Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); *Safeway Stores, Inc. v. Vance*, 355 U.S. 389, 78 S.Ct. 358, 2 L.Ed.2d 350 (1958).

**8.** 15 U.S.C. § 13(a) provides in pertinent part: It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either of any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substan-

tially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . .

**9.** *See Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); *Walker Oil Co. v. Hudson Oil Co.*, 414 F.2d 588, 590, *rehearing denied*, 414 F.2d 591 (5th Cir. 1969); *Hartley & Parker, Inc. v. Florida Beverage Corp.*, 307 F.2d 916 (5th Cir. 1962); *Loren Specialty Mfg. Co. v. Clark Mfg. Co.*, 241 F.Supp. 493, 494, 498 (N.D.Ill.1965), *aff'd*, 360 F.2d 913 (7th Cir.), *cert. denied*, 385 U.S. 957, 87 S.Ct. 392, 17 L.Ed.2d 303 (1966).

**10.** *See Bruce's Juices, Inc. v. American Can Co., supra; A. J. Goodman & Son, Inc. v. United Lacquer Mfg. Corp.*, 81 F.Supp. 890, 892 (D.Mass.1949); *Loren Specialty Mfg. Co. v. Clark Mfg. Co., supra; Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y.1976); *Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 278 F.Supp. 938, 970 (C.D.Cal.1967), *rev'd on other grounds*, 437 F.2d 1336 (9th Cir. 1970).

trict court's rejection of appellant's section 2(a) claim on the ground that a transfer of sheet music and music books between two subsidiaries, both wholly-owned by one individual, was not a sale within the Act. The court reasoned that the two subsidiaries were "so closely related that the latter could not be considered a 'purchaser' from the former for the purposes of the Robinson-Patman Act." *Id.* at 971.

The court found that the corporations had the same officers, directors, employees, office space, and business records. All accounting and payroll transactions were handled by one of the subsidiaries. In addition, the "sales" of sheet music and music books were merely bookkeeping adjustments. Finally, all music "sold" to the sister company and not resold to consumers was simply returned to the transferring company. The court held that the two subsidiaries were "parts of a single integrated enterprise and that transfers between them were indistinguishable from dealings within the same corporate entity." *Id.* at 972.

In *Parrish v. Cox*, 586 F.2d 9 (6th Cir. 1978), the Sixth Circuit articulated a similar rule emphasizing the element of control in determining a "sale." In *Parrish*, Cox Oil Co., the parent gasoline distribution company, sold gasoline to independent dealers. One of the independent filling station operators, Parrish, sued for price discrimination under the Robinson-Patman Act when he discovered that Cox was selling gasoline to the company-managed stations at cheaper prices. Parrish argued that a sale between a parent corporation and a wholly-owned subsidiary could constitute a sale within the meaning of the Act. The Sixth Circuit affirmed the district court's ruling that the parent company exercised such control over the company-managed stations that there could be no sales between them.

The elements of control cited by the district court were the parent's daily supervision of the subsidiary's operations, its maintenance of their business records, its maintenance of all employees in the general payroll, and its making of all management decisions including the setting of retail prices.

The Fifth Circuit in *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir. 1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1980), has categorically adopted the rule that under no circumstances can an intra-enterprise transfer be deemed a sale for purposes of satisfying the "two sales" requirement of the Robinson-Patman Act. Plaintiff in *Security Tire* had asked the court to compare the price difference between a tire manufacturer and its independent customer (the disfavored customer) and the tire manufacturer and its wholly-owned subsidiary (the favored customer). The circuit court denied plaintiff's price discrimination theory, holding that "a parent corporation's transfers to its wholly-owned subsidiary may not be considered separate sales to a favored customer in a Robinson-Patman Act price discrimination suit." *Id.* at 967. According to the court, an analysis which focuses on extent of control by the parent over the subsidiary is unrealistic. The court also pointed out that the control analysis for intra-enterprise transfers is inconsistent with a facet of the same seller doctrine and independent purchaser doctrine where the parent and wholly-owned subsidiary are treated as a single economic unit.

■ *Hansen, Parrish,* and *Security Tire, supra,* albeit for different, but not inconsistent, reasons, assert the rule that intra-enterprise transfers cannot be considered sales for Robinson-Patman Act price discrimination purposes. This Court adopts that as the controlling law in this case.

### 2. Single Seller Doctrine

■ It is well settled law that a parent and its wholly-owned subsidiary can be considered a single economic entity when comparing the price difference between a customer of the parent corporation and a customer of the wholly-owned subsidiary. The general rule, sometimes referred to as the "single seller doctrine," is that a purchase from a wholly-owned subsidiary will be considered as if it were made from the parent company if the subsidiary is the alter ego or mere tool, agent or instrumentality of the parent, without a separate existence and

pricing policy of its own. The critical element in determining whether parent and subsidiary are to be treated as a single seller is control, particularly control of the subsidiary's pricing and distribution policies.[11]

3. Plaintiff's price discrimination theory

Island Tobacco argues that it has met the requirement under section 2(a) that there be two or more contemporaneous sales by the same seller. For purposes of price comparison there has been one direct sale from RJR Tobacco to RJR Hawaii and another indirect sale from RJR Tobacco through its totally controlled subsidiary, RJR Hawaii.

Island Tobacco relies on *Danko v. Shell Oil Co.*, 115 F.Supp. 886 (E.D.N.Y.1953) for the proposition that intra-enterprise transfers between a parent and its wholly-owned subsidiary are sales within the meaning of the Robinson-Patman Act. In *Danko*, the district court recognized that such a claim was possible, and refused to dismiss the complaint which alleged that defendant, a large gasoline distributor, discriminated in price between the plaintiff, an independent service station, and one of its competitors, a service station owned by defendant. Under *Danko* the direct transfer of cigarettes from RJR Tobacco to RJR Hawaii would arguably be a "sale."[12]

Next, Island Tobacco argues that under the single seller or indirect purchaser doctrine, RJR Tobacco and RJR Hawaii constitute a single seller, and its purchases from RJR Hawaii, the subsidiary, are in effect purchases from RJR Tobacco, the parent.

Implicit in Plaintiff's argument is the contention that RJR Tobacco maintains suffi-

cient control over the pricing policies of RJR Hawaii. Plaintiff relies on and cites to *Purolator Products, Inc. v. F.T.C.*, 352 F.2d 874 (7th Cir. 1965), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968): ·

> If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical purposes dealing directly with the seller. If the seller controls the sale, he is responsible for the discrimination in the sale price if there is such discrimination.

*Id.* at 883.

Plaintiff's price discrimination theory fails from the outset insofar as this Court has earlier adopted the rule that intra-enterprise transfers are not "sales" with the Robinson-Patman Act. However, even without this Court's adoption of this rule, Plaintiff's theory would still fail.

■ Plaintiff's reliance on *Danko, supra*, makes its price discrimination theory internally inconsistent. Although Plaintiff purchases cigarettes from RJR Hawaii, it can prove that RJR Tobacco had made a sale to Island Tobacco only by showing that RJR Tobacco and RJR Hawaii constitute a single seller. This requires the Court to find sufficient control by parent over subsidiary.

On the other hand, from an analytical perspective, Island Tobacco can prove a sale from RJR Tobacco to RJR Hawaii (parent to subsidiary) only if there is some showing of lack of control by the parent or some unusual degree of purchasing autonomy by the subsidiary.

---

11. See *Baim & Blank, Inc. v. Philco Corp.*, 148 F.Supp. 541 (E.D.N.Y.1957) (lack of control as to prices and sales policy resulted in finding that subsidiary was not an instrumentality or alter ego of parent); *Reines Distributors, Inc. v. Admiral Corp.*, 256 F.Supp. 581, 585 (S.D.N.Y. 1966) ("corporate veil between parent and subsidiary will be disregarded when control asserted by the parent is significant...."); *National Lead Co. v. F.T.C.*, 227 F.2d 825, 829 (7th Cir. 1955), *rev'd on other grounds*, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957) (to establish identity between parent and subsidiary "there must be evidence of such complete control of

subsidiary by the parent as to render the former a mere tool of the latter, and to compel the conclusion that the corporate identity of the subsidiary is a mere fiction."). See *also Massachusetts Brewers Ass'n. v. P. Ballantive & Sons Co.*, 129 F.Supp. 736 (D.Mass.1955). ·

12. This Court has discovered no cases wherein this "sales" theory has been applied to find liability. *Danko* was later distinguished and severely limited by the same court. See *Diehl & Sons v. International Harvester Co., supra*, 426 F.Supp. at 123 n. 20.

Plaintiff cannot logically argue both control and noncontrol at the same time. Plaintiff's price discrimination theory is thus logically and legally inconsistent. Plaintiff's Motion for Partial Summary Judgment on the basis that the "transfer" prices are discriminatory within the meaning of section 2(a) of the Clayton Act is DENIED, and Defendants' Motion for Summary Judgment on the Robinson-Patman Act claim as alleged in Count I is GRANTED.

### B. Unfair Method of Competition Claims

Plaintiff's Motion for Partial Summary Judgment on the basis that Defendants' have engaged in unfair methods of competition in violation of Hawaii Rev.Stat. § 480-2[13] is GRANTED for the reasons stated below.

On April 25, 1977, the Circuit Court of the First Circuit, State of Hawaii, ruled from the bench that RJR Hawaii had engaged in predatory pricing in violation of Hawaii Rev.Stat. § 481-3. By order dated June 28, 1977, the state court ruled that RJR Hawaii had set its prices below its "fully allocated costs." The state court also ordered Defendants to terminate their cost compensation agreement of July 15, 1975.

In response to this order RJR Hawaii failed to adjust its prices upward to at least meet fully allocated costs; instead Defendants attempted to circumvent the state court order by discontinuing the cost compensation subsidy but then dropping prices down to a level sufficient to compensate for the termination of the subsidy. This disguised subsidy in the form of a low "transfer" price was instituted on May 2, 1977, seven days after the April 25, 1977, bench ruling on the original subsidy.

Without a subsidy, RJR Hawaii could not have offered the "attractive" prices that have allegedly injured Island Tobacco. As a pretext for compliance with the state court order, RJR Tobacco simply lowered its prices to RJR Hawaii to compensate for the lost cost reimbursement subsidy, thereby allowing RJR Tobacco to continue its former pricing program. RJR Tobacco has admitted this much in its Answers to Interrogatory No. 2 filed on November 16, 1979:

On April 25, 1977 ... Judge Shintaku ruled from the bench that a reimbursement contract between RJR Tobacco and RJR Hawaii was improper. Thereafter, the Assistant Comptroller of RJR Tobacco, William F. Clingman, III, recommended to R. F. Arfmann, the Director of Sales Planning and Development of RJR Tobacco, that transfer prices be instituted for goods sold by RJR Tobacco to RJR Hawaii .... Mr. Arfmann agreed and transfer prices were instituted on May 2, 1977 .... Mr. Clingman *pegged the transfer prices at amounts which were equal to the prices charged RJR Hawaii prior to the Court's ruling less the reimbursement sums which had been credited to RJR Hawaii* .... (Emphasis Added.)

■ The continuance of an unlawful pricing program in contravention of an order of a court of competent jurisdiction is, as a matter of law, an unfair method of competition under Hawaii Rev.Stat. § 480-2.

In interpreting Hawaii Rev.Stat. § 480-2, this Court is guided by section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45[14] as mandated by Hawaii Rev.Stat. § 480-3 which states:

*Interpretation.* It is the intent of the legislature that in construing Section 480-2 the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act.

---

13. Hawaii Rev.Stat. § 480-2 states in full:

*Unfair competition, practices, declared unlawful.* Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

14. 15 U.S.C. § 45 states in pertinent part:

Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

■ Under section 5 of the Federal Trade Commission Act, it is an unfair method of competition to violate any other specific trade regulation statutes. Federal law also dictates that attempts to circumvent antitrust statutes are prohibited under the Act. *See Grand Union Co. v. F. T. C.*, 300 F.2d 92 (2d Cir. 1962). Unfair trade practices which violate the spirit of the antitrust laws fall within the purview of the Federal Trade Commission Act. *See F. T. C. v. Sperry & Hutchinson*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *F. T. C. v. R. F. Keppel and Brother, Inc.*, 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934).

Defendants' argument against the unfair trade practice claim is essentially two-fold. First, RJR Hawaii and RJR Tobacco comprise a unitary economic enterprise. They do not compete with each other. RJR Hawaii, according to Defendants, is completely dominated by its parent, and as a single economic entity it is not capable of making "sales" or "pricing" transactions to itself. In this limited instance, however, the fact of unitary economic enterprise should not be imposed as a technical defense to predatory pricing. If this defense were allowed, vertically integrated monopolists[15] could charge predatory prices with impunity so long as the "sales" are between totally controlled subsidiaries.

Secondly, Defendants contend that as a matter of federal law, below cost sales are predatory only when they are below marginal or average variable costs. This test has been used extensively by the Ninth Circuit. *See Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727 (9th Cir. 1979).

In *State of Arizona v. Maricopa County Medical Society*, 643 F.2d 553, 559 n.6 (9th Cir. 1980), the Ninth Circuit recently stated that although they have entertained the possibility of proving predation by marginal or average cost statistics, this mode of proof is not exclusive. The court in *Maricopa*, listing some of the many authorities in this area, noted that "there is nothing like agreement concerning the signs by which predation is identifiable." *Id.* The problem lies in formulating a workable formula for determining predatory pricing. *See, e. g.*, Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975); Scherer, *Predatory Pricing and the Sherman Act: A comment*, 89 Harv.L.Rev. 869 (1976); Areeda & Turner, *Scherer on Predatory Pricing: A Reply*, 89 Harv.L.Rev. 891 (1976); Scherer, *Some Last Words on Predatory Pricing*, 89 Harv.L.Rev. 901 (1976); Williamson, *Predatory Pricing: A Strategic & Welfare Analysis*, 87 Yale L.J. 284 (1977); Areeda & Turner, *Williamson on Predatory Pricing*, 87 Yale L.J. 1337 (1978).

■ The Ninth Circuit's determination that the appropriate predatory pricing standard is whether a firm sets prices below marginal cost does not preempt state statutes which rely on the "fully allocated cost standard." *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 461 F.Supp. 410 (N.D.Cal.1978).

In *Continental Baking*, a federal district court found defendants liable for violations of the California Unfair Practices Act (Cal. Bus. & Prof.Code § 17000, *et seq.*). The California Unfair Practices Act makes it unlawful to sell a product below cost for the purpose of injuring competition. The cost standard established by statute in California is that of fully allocated cost. While the court noted that this was a different approach than the one adopted in *Janich* and *Hansen, supra*, it held that federal law does not preempt state regulation in this area.

---

**15.** Vertical integration describes the extent to which a firm is involved in more than one stage of the development of a product from the time it is manufactured until it is sold to ultimate consumers. It can be distinguished from horizontal integration, which describes a firm which makes or sells more than one product.

The marginal cost standard is not necessarily the generally accepted cost standard in predatory pricing cases. Although it has been adopted by several circuits, there is considerable scholarly debate about the issue. The Supreme Court has never ruled on the question and a study of the legislative history understandably fails to cast any light on the subtle nuances between the various definitions of "cost."

461 F.Supp. at 423.

■ Marginal cost, variable cost, and average variable cost concepts [16] are purely economic standards for finding predatory pricing. These definitions ignore important factors going to the motive and intent of the actor such as: timing of the price cut; the particular growth cycle of the firm; and the circumstances and the duration of the price cut. *See* Williamson, *Predatory Pricing: A Strategic & Welfare Analysis, supra.* These factors are important here because they raise additional indicia for a showing of predatory intent. In applying these factors to RJR Tobacco it is significant that: (1) this is Defendants' first attempt, in the United States, to vertically integrate the direct distribution market; [17]

Defendants' low prices were timed to coincide with entry into the market; (3) RJR Tobacco's transfer price to Hawaii is lower than anywhere else in the United States, notwithstanding generally higher transportation and warehousing costs in Hawaii; (4) RJR Tobacco's cost compensation subsidy covered more than the cost for services which RJR Tobacco had generally performed for itself prior to incorporation.

### III. Section 1 Claims

■ Defendants seek summary judgment in their favor on Count II of Plaintiff's complaint which alleges a conspiracy in restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Also appended to Count II are state claims for violation of Hawaii Rev.Stat. §§ 480–4 [18] and 480–9.[19] Legislative history of Hawaii's antitrust law clearly indicates that the state laws are to be interpreted and construed in harmony with analogous federal antitrust laws.[20]

Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the

---

16. Marginal cost is the addition to total cost from producing an additional unit of output. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, supra,* 88 Harv.L.Rev. at 700. Variable costs are costs which vary with changes in output. *Janich Bros., Inc. v. American Distilling Co., supra,* 570 F.2d at 858 n.11, *citing* Areeda & Turner, *supra* at 700. Variable costs typically include such items as materials, fuel, labor directly used to produce the product, indirect labor such as foremen, clerks, custodial help, utilities, repair and maintenance, and per unit royalties and license fees. Average variable cost is the costs that vary with changes in output divided by the output. *Id. See also International Air Industries v. American Excelsior Co.,* 517 F.2d 714, 724 n. 27 (5th Cir. 1975).

17. The degree of integration indicates the extent to which the market varies from the competitive model, which holds that economic activity could be carried on by an infinitely large number of infinitely small firms each being the best possible size and working at the optimum level of efficiency. Adelman, *Integration and Antitrust Policy,* 63 Harv.L.Rev. 27, 28 (1949).

18. Hawaii Rev.Stat. § 480–4 states in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal.

19. Hawaii Rev.Stat. § 480–9 is the State of Hawaii's monopolization statute. This claim is left for discussion under monopolization claims below.

20. Legislative history of Hawaii's antitrust statutes clearly indicates that it was the intention of the legislature to rely on and refer to federal antitrust law for guidance and interpretation. The House Conference Committee in discussing what subsequently became Hawaii Rev.Stat. § 480–4, noted that "[i]t is the intention of subsection (1) [§ 480–4] to retain the language and interpretation of Section 1 of the Sherman Act and it is not intended to be restricted or limited by any other subsections of this section." *House Conference Committee Report No. 19,* H.B. No. 27, H.D. 2, S.D. 2, C.D. 1 (May 27, 1961) at page 3.

several States, or foreign nations is declared to be illegal.

Defendants contend at the outset that Plaintiff has failed to prove the requisite plurality of actors necessary to prove a conspiracy claim and that as a matter of law this Court should deny the § 1 claim. Defendants claim that in spite of their separate incorporation, RJR Tobacco and RJR Hawaii constitute a single economic unit and are incapable of combining, contracting, or conspiring within the meaning of the Sherman Act.

There is no dispute as to the relationship between the several Defendants.

This Court begins by rejecting Defendants' claim that RJR Industries is not subject to the personal jurisdiction of this Court. The general question in deciding the limits of state court jurisdiction over nonresident Defendants is whether these Defendants have had such "minimum contacts" with the state "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

■■■ The undisputed record indicates that RJR Industries had sufficient contacts with the State of Hawaii to permit a finding of personal jurisdiction. RJR Industries maintains a bank account at the Bank of Hawaii as part of its centralized cash management services which it as a parent provides to its wholly owned corporate subsidiaries. Virtually all of RJR Hawaii's receipts go into this account. RJR Industries' Credit Department audited the unincorporated division of RJR Tobacco in Hawaii prior to 1975. In 1968, 1969, and 1970 RJR Industries sent representatives to Hawaii to audit RJR Tobacco's warehouse, take inventory, and balance the stock. RJR Industries' Accounting Department has conducted two audits of RJR Hawaii since 1975.

■■■ Personal jurisdiction will be found when foreign corporations have placed their employees within the forum state. *See World-Wide Volkswagen Corp. v. Woodson,*

444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980). RJR Industries has placed its employees in the State of Hawaii. The original directors of RJR Hawaii were two Sales Department management employees of RJR Tobacco, and an attorney from RJR Industries who provided services in setting up the corporation. Other officers of RJR Hawaii are also employees of RJR Industries.

■■■ RJR Industries' "minimum contacts" with the State of Hawaii are such that it could reasonably anticipate being haled into court in Hawaii. RJR Industries has availed itself of the privileges and benefits of Hawaii law and is therefore subject to the jurisdiction of this Court.

A. Single Economic Entity Defense

■■■■ The showing of a combination or conspiracy is a threshold requirement which must be met before determining the reasonableness of the alleged restraint of trade. By definition a combination or conspiracy requires an agreement between two or more parties to engage in anticompetitive conduct. The statutory intent behind this requirement is that anticompetitive conduct done in concert with others is a greater threat to the sound operation of a free economy than the conduct of a single individual acting alone. The Supreme Court has repeatedly stated that related corporations, notwithstanding their legal distinction, may be capable of conspiracy. *Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Nevertheless, in this Circuit, "the mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy." *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 456 (9th Cir. 1979). *See also Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614 (9th Cir. 1979), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 854 (1980); *Knutson v.*

*Dailey Review, Inc.,* 548 F.2d 795 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620 (9th Cir. 1977).[21]

This Court is faced with the decision, then, of deciding whether RJR Tobacco and RJR Hawaii are a single economic unit separated only by the technicality of separate incorporation. The Ninth Circuit has held that the capacity of related corporations to conspire, in violation of § 1, is a question of fact to be answered under the circumstances in each case. *See Las Vegas Sun, Inc. v. Summa Corp., supra,* 610 F.2d at 617–618. *Accord, Ogilvie v. Fotomat Corp.,* 641 F.2d 581 (8th Cir. 1981).

■ Upon review of the major opinions in this area, this Court is convinced that a "control" test can be distilled as an aid in determining the limits of intra-enterprise conspiracy between a parent and wholly-owned subsidiary. The degree of control the parent exercises over its subsidiary is a determining factor in deciding whether the necessary plurality of actors exists for § 1 purposes. A multi-corporate enterprise with the parent exercising control over the operations and policy of its subsidiaries should logically be viewed as "one mind" whose parts are incapable, either through agreements or coordinated activity, of conspiring with each other. Where the parent controls in large part the day-to-day managerial decisions of the wholly-owned subsidiary, there is in economic effect only one competitive force operating in the market, *i. e.,* only one decision-making unit.[22]

Prior to 1975, RJR Tobacco operated in Hawaii through an unincorporated division. RJR Tobacco completely controlled this division. The form and degree of control did not change when RJR Hawaii became incorporated. RJR Hawaii was set up and is now run by RJR Tobacco. The directors of RJR Hawaii are employees of RJR Tobacco. The parent company controls the assignments and transfers of company officials to and from RJR Hawaii. The corporation's day-to-day activities are conducted through a general manager selected by RJR Tobacco. RJR Tobacco audits RJR Hawaii and provides accounting functions. RJR Hawaii's budget is submitted and approved by the parent. All advertising, sales, and promotional activities conducted on a national level by RJR Tobacco are similarly conducted by RJR Hawaii at the institution of RJR Tobacco. RJR Tobacco controls the pricing policy of its subsidiary. The relationship here of parent and subsidiary far exceeds the "mere ownership of the subsidiary's stock." *Knutson v. Dailey Review, Inc., supra,* 548 F.2d at 802.

■ The undisputed facts are sufficient to support this Court's decision that RJR Tobacco controls its wholly-owned subsidiary, RJR Hawaii, to such a degree that the two entities in substance constitute a single economic unit which is incapable of conspiring with itself.[23]

21. Each of the Supreme Court cases suggests the validity of an intra-enterprise conspiracy theory, but in each case there was at least one alternative basis for finding an antitrust violation. The Ninth Circuit cases, similarly, accept the intra-enterprise conspiracy theory but provide little analysis for the rule or define the scope of its application.

22. Where independent firms agree to fix prices, they reduce the number of economic units with market price discretion. Allocative inefficiency occurs where, for example, open market discretion is eliminated and firms agree to fix prices above the marginal cost of production, which is the level toward which prices tend to move if many firms within the market freely compete with each other. Section 1 should attack such agreements if they result in a decrease in the number of units with market discretion. Therefore, section 1 should not apply if a parent controls the day-to-day operations of its subsidiary, since the entire enterprise presents the market with one decision-making unit.

23. Report of the U.S. Attorney General's National Committee to Study the Antitrust Laws, supports this conclusion:

> The use of subsidiaries is generally dictated by normal, prudent business considerations. No social objective would be obtained were subsidiaries enjoined from agreeing not to compete with each other or with their parents. To demand internal competition between the members of a single business unit would invite chaos without promotion of the general welfare. *Id.* at 33.

This court next considers the conspiracy claim as it relates to RJR Industries and RJR Tobacco. The factual record indicates that as to these parties the threshold requirement that there be a showing of agreement and combination between two or more parties has been met. RJR Industries participated in the decision to incorporate RJR Hawaii; it approves price changes to RJR Tobacco; it participated in the decision to terminate Plaintiff's credit; and it maintains close supervision of RJR Hawaii's business and banking operations.

Defendants have not raised the single economic unit defense as to RJR Industries and RJR Tobacco. The record is insufficient for this Court to make any determination as to the degree of control or lack of control which RJR Industries exerts over RJR Tobacco's day-to-day activities. For this reason, the Court makes no ruling as to whether the single economic unity defense is available to these parties.

### B. Restraint of Trade

Having found the necessary plurality of actors, the Court next looks to the reasonableness of their "contract, combination, ... or conspiracy...." The United States Supreme Court has long recognized the importance of what has become known as the "Rule of Reason" in determining what constitutes a "restraint of trade or commerce." Section 1 states that "every" contract which restrains trade is unlawful. But, as Justice Brandeis perceptively noted in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), restraint is the very essence of every contract, and section 1, if read literally, would outlaw the entire body of private contract law.[24] Under a rule of reason analysis, consideration must be given to the possible justification for the questioned activity. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

In examining the reasonableness of a particular conduct in the marketplace, motive and purpose behind the restraint are key considerations. Conduct may be motivated by legitimate business purposes, consistent with industry-wide practices, in which case there can be no anticompetitive effects. On the other hand, conduct whose purpose is to destroy a competitor or to create a monopoly through predatory means is proscribed by the antitrust laws.

Plaintiff claims that Defendants' activities, viewed in their entirety or as individual acts, manifest an intent to unreasonably restrain trade and competition. Plaintiff refers to the following activities as a manifestation of Defendants' unlawful intent: (1) Defendants' termination of Island Tobacco's credit in December 1973; (2) Defendants' decision to set up an innovative and unique direct distribution system in Hawaii; (3) Defendants' decision to sell cigarettes at "attractive" prices made possible through a cost compensation agreement; and finally, (4) Defendants' subsequent initiation and maintenance of discriminatory "transfer" prices.

Defendants have maintained throughout these proceedings that their conduct now under antitrust scrutiny is and has been motivated by legitimate business interests and cannot as a matter of law be held to be an unreasonable restraint of trade.

Defendants have demonstrated that their decision to terminate Island Tobacco's credit and to set up a direct distribution system in Hawaii was based on valid, bona fide and reasonable business reasons. Island Tobacco was in financial difficulty at the time of the credit termination. Prior to late 1973, RJR Tobacco had extended credit to Island Tobacco. RJR Tobacco required that annual financial statements be submitted to provide a reasonable assurance of payment.

---

**24.** *See also United States v. Topco Assoc., Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1971). ("Were § 1 to be read in the narrowest way, any commercial contract could be deemed to violate it.") For some of the major cases applying the Rule of Reason, *see Mitchell v. Reynolds*, 1 P.Wms. 181, 24 Eng.Rep. 374 (1711); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

During 1973, RJR Tobacco became increasingly aware of Island Tobacco's financial problems. A check had been returned for insufficient funds. A 1972 financial statement revealed a loss and that the company was heavily indebted to City Bank. The 1973 financial statements revealed the following extraordinary changes in Island Tobacco's balance sheet: (1) under "accounts receivable," the "receivable from officer-stockholder" which had previously been fairly constant in the neighborhood of $150,000–$200,000, had suddenly increased to $791,735; (2) stockholders' equity, which had previously been in the neighborhood of $50,000, dropped to a deficit of $439,053; (3) working capital went from a $205,000 deficit to a $1,313,797 deficit; (4) net loss increased to approximately $534,000, compared to approximately $10,765 previously; (5) interest on City Bank notes was accruing at 8%, or approximately $100,000 per year.

Plaintiff argues that its credit termination is a direct result of Defendants' desire, as a dominant firm in the cigarette market, to seize control of the service jobbing market in Hawaii. The termination of credit would lower Plaintiff's ability to supply RJR Tobacco products and thereby create an optimal condition for Defendants' anticipated entry into the market. But antitrust laws are designed to protect competition not competitors. In light of the abundant evidence indicating the poor credit risk of Island Tobacco, Defendants' decision to terminate its credit terms is not unreasonable.

Defendants' decision to set up a new and innovative direct distribution system in Hawaii is similarly not unreasonable in light of the undisputed facts. By late 1974, the retailer customers that were supposed to have been serviced by Island Tobacco were experiencing frequent out-of-stock conditions of RJR Tobacco products. RJR Tobacco's market share among independent retailers in Hawaii declined in 1974 to approximately 18% statewide and 12% on Oahu as compared to RJR Tobacco's nationwide market share of 33⅓%. In addition, Island Tobacco refused to carry and sell newly introduced products such as Winston Lights which had been heavily advertised throughout the country. Finally, Island Tobacco refused to handle stale or damaged RJR Tobacco goods which were returned by retailers despite the fact that Island Tobacco provided this service as to the products of other manufacturers. The direct distribution system was a reasonable solution to the many distribution problems Defendants had been experiencing with Island Tobacco.

Defendants' pricing decisions are not so easily justified. The competitive effect of Defendants' "attractive" prices, the cost compensation agreement, and the subsequent institution of lower "transfer" prices raise serious questions which cannot be fully answered without further inquiry going beyond the facts contained in these motions for summary judgment. If Defendants have in fact engaged in predatory below cost pricing, then by definition they have acted unreasonably in restraint of trade, and the elements of a prima facie case for a conspiracy in restraint of trade will be met.

Plaintiff has been able to show that a genuine question exists as to the issue of predatory behavior resulting from Defendants' pricing policy. Because of this issue of fact, Defendants' motion for summary judgment as to § 1 claims is DENIED.

IV. Section 2 Claims

Defendants seek summary judgment in their favor as to Count III of Plaintiff's complaint. Count III alleges monopolization and attempt to monopolize in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 and Hawaii Rev.Stat. § 480–9.[25]

The alleged violation is three-fold. First, Plaintiff claims that Defendants have been using their dominant market position in the national cigarette manufacturing business to monopolize and to attempt to monopolize the service jobbing of RJR Tobacco prod-

---

**25.** Hawaii Rev.Stat. § 480–9 states in full:

No person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State.

ucts in Hawaii. Secondly, Plaintiff claims that its elimination from the service jobbing business would insure Defendants not only a monopoly on service jobbing of RJR Tobacco products in Hawaii but also a monopoly of service jobbing of all tobacco products. Thirdly, Plaintiff claims that Defendants have engaged in a conspiracy to monopolize the service jobbing market for both RJR Tobacco products and all tobacco products in the State of Hawaii.

Section 2 establishes three separate offenses: (1) monopolization; (2) attempt to monopolize; and (3) combination or conspiracy to monopolize, any part of trade or commerce among the several states.[26]

### A. Monopolization Claims

■ The offense of unlawful monopolization requires proof of the possession of monopoly power in a relevant market, plus an overt act which establishes a purpose or general intent to acquire, use, or preserve such power.[27] In *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966), the Supreme Court restated this definition:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

### 1. Geographic Market

■ Monopoly power is established by proof of the relevant market and by showing that Defendant maintains a sufficient degree of power within that market to control prices or exclude competition. The relevant market is defined by both geographic and product standards. *See Independent Iron Works, Inc. v. United States Steel*

Corp., 322 F.2d 656 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

■ The relevant geographic market is limited to the boundaries of competition. It is the area where sellers of a particular product or service operate and where purchasers can realistically turn for their products or services. *See Tampa Electric Co. v. Nashville Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961); *Standard Oil Co. v. United States*, 337 U.S. 293, 299 n.5, 69 S.Ct. 1051, 1055 n.5, 93 L.Ed. 1371 (1949). Here, the service market is that of service jobber. The geographic market is clearly limited by the physical boundaries of the State of Hawaii.

### 2. Monopoly Power

"Monopoly power is the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). "[S]ize is of course an earmark of monopoly power." *United States v. Griffith*, 334 U.S. 100, 107 n.10, 68 S.Ct. 941, 946 n.10, 92 L.Ed. 1236 (1948). And "[t]he existence of such power ordinarily may be inferred from the predominant share of the market." *United States v. Grinnell Corp., supra*, 384 U.S. at 571, 86 S.Ct. at 1704.

In *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), the court remarked that 90 percent of supply "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough, and certainly thirty-three percent is not." *Id.* at 424. Although other factors such as relative size and strength of competitors, and freedom of entry are often taken into consideration when determining monopoly power from market share, the facts before this Court are sufficient to find that Defendants lack

---

**26.** 15 U.S.C. § 2 broadly states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, among the several states . . . shall be deemed guilty of a felony. . . .

**27.** *See United States v. Aluminum Co. of America, supra*, 148 F.2d 416; *United States v. United Shoe Mach. Corp.*, 110 F.Supp. 295 (D.Mass. 1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

the necessary market share and hence monopoly power in the service jobbing of all tobacco products in the State of Hawaii. At no time has RJR Hawaii maintained more than 22 percent of the combined statewide market for cigarettes. At present, RJR Hawaii's market share is approximately 19.8 percent.

Plaintiff also alleges that Defendants are guilty of intrabrand monopolization, i. e., monopolization of the market for RJR Tobacco products. This contention is untenable as a matter of law. Every manufacturer has a natural monopoly in the sale and distribution of his own product, especially when the product is sold under a trademark. *United States v. E. I. duPont de Nemours & Co., supra,* 351 U.S. at 393, 76 S.Ct. at 1006; *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1344 (9th Cir. 1970); *A–1 Business Machine Co. v. Underwood Corp.,* 216 F.Supp. 36, 37 (E.D.Pa.1963); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.,* 403 F.Supp. 643 (E.D.Pa.1975).

Plaintiff's monopolization charge alleging a conspiracy between RJR Industries and RJR Tobacco to obtain a monopoly position in the service jobbing of both RJR Tobacco products and all tobacco products is vague and illusive, and defective for the same reasons expressed under the above monopolization claims.

### B. Attempt to Monopolize Claim

The basis of the § 2 attempt to monopolize claim is alleged predatory activity by RJR Hawaii in the below cost sales of its tobacco products to its retail customers. To establish a prima facie case, a plaintiff must prove three elements: (1) a specific intent to control prices or destroy competition with respect to a part of commerce; (2) predatory conduct directed toward accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Janich Bros. Inc. v. American Distilling Co.,* 570 F.2d 848, 853 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Proof of the second element, predatory or anticompetitive conduct, may in some instances permit an inference of the first element, specific intent, and the third element, dangerous probability. *Id.* at 854.

Here, again, the issue of predatory below cost pricing is a critical element since specific intent and dangerous probability of success may be inferred from direct proof of predatory conduct. Defendants offer affidavits indicating that RJR Tobacco and RJR Hawaii set their prices above variable costs and that net profits were made in 1975 and 1976. Plaintiff questions Defendants' figures for variable costs by arguing that certain fixed costs should be included under variable costs. This appears possible since the reimbursable costs, under the agreement, are arguably part of RJR Tobacco's fixed costs of doing business, yet were expanded to include certain RJR Hawaii costs incurred in the direct distribution system to retail accounts. In addition, Plaintiff argues that "net earnings" figures provided by Defendants are mere bookkeeping manipulations, and that they have been unable because of Defendants' lack of cooperation in discovery, to get a further breakdown of costs from which to make their own calculations.

Defendants' motion for summary judgment on Count III is GRANTED on the monopolization and conspiracy to monopolize claims. It is DENIED as to the attempt to monopolize claim because of the unresolved factual issue of predatory below cost pricing.

### V. Summary

A. On Plaintiff's Motion for Partial Summary Judgment:

1. As to the claim of price discrimination under section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) summary judgment is DENIED.

2. As to the claim of unfair trade practice under Hawaii Rev.Stat. § 480–2, summary judgment is GRANTED.

B. On Defendants' Motion for Summary Judgment:

1. As to Count I:

(a) This Court rules that summary judgment as to claims under Hawaii Rev.Stat. § 481–3 is not appropriate and is therefore DENIED.

(b) As to the Robinson-Patman Act claim (15 U.S.C. § 13), summary judgment is GRANTED.

2. As to Count II:

(a) As to Defendants' claims under section 1 of the Sherman Act and Hawaii Rev.Stat. § 480–4, summary judgment is DENIED on the ground that genuine issues of material fact exist as to the reasonableness of Defendants' pricing policies.

3. As to Count III:

(a) As to all monopolization claims, summary judgment is GRANTED.

(b) As to the conspiracy to monopolize claim, summary judgment is GRANTED.

(c) As to the attempt to monopolize claims, summary judgment is DENIED on the ground that genuine issues of material fact exists as to the predatory effect of Defendants' pricing policies.

4. As to Count IV:

(a) As to the price discrimination claim under section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, summary judgment is GRANTED.

(b) This Court rules that summary judgment as to claims under Hawaii Rev.Stat. § 481–1 is not appropriate and is therefore DENIED.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED in part and GRANTED in part, and that Defendants' Motion for Summary Judgment is DENIED in part and GRANTED in part in accordance with this decision.