**BARTLEYS TOWN AND COUNTRY SHOPS, INC., a Hawaii corporation, Plaintiff,**

v.

**DILLINGHAM CORPORATION, a Hawaii corporation, Defendant.**

**Civ. No. 79–0600.**

United States District Court, D. Hawaii.

Jan. 6, 1982.

Ted Gamble Clause, Robert A. Marks, Honolulu, Hawaii, for plaintiff.

Burnham H. Greeley, Gerald A. Sumida, Terence J. O'Toole, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, for defendant.

## DECISION AND ORDER

SAMUEL P. KING, Chief Judge.

## I. INTRODUCTION

This is a treble damage antitrust action brought against a shopping center for alleged anticompetitive conduct in refusing to renew Plaintiff's lease. Defendant seeks dismissal of the complaint under Fed.R. Civ.P. 12, or in the alternative for Summary Judgment under Fed.R.Civ.P. 56. The complaint is stated in twelve counts and alleges violations of both federal and state antitrust statutes. The parties are not diverse but jurisdiction is based on the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Act, 15 U.S.C. §§ 14, 15 and 22.

## II. Factual Background

Plaintiff, Bartleys Town and Country Shops, Inc. (Bartleys) is a Hawaii corporation with its principal place of business in Hawaii. Bartleys is engaged in the business of retailing women's wear. It also sells accessories and gift items, but at all times relevant to this action women's apparel has been the main category of sales. Bartleys is a family owned and operated business, and has been in existence for approximately twenty years. Bartleys presently owns eight stores located exclusively in the State of Hawaii.[1]

Defendant, Dillingham Corporation (Dillingham) is also a Hawaii corporation with its principal place of business in Hawaii. Dillingham is the owner and manager of the Ala Moana Center (Ala Moana) which is the largest shopping center on Oahu, Hawaii. Dillingham is in the business, *inter alia*, of leasing commercial space at Ala Moana to lessees who sell goods and services at retail to the public. Dillingham issues leases for such space under standard form leases and under generally uniform terms, including the payment by the lessee of a minimum rent plus a percentage rent based on the gross sales of the lessee at Ala Moana.

On October 27, 1965, Bartleys leased approximately 2,875 square feet of retail space at Ala Moana from Dillingham for the purpose of establishing a women's retail shop. This lease (the 1966 Lease) provided for an eight year term beginning on July 1, 1966, and terminating on June 30, 1974. When the 1966 Lease expired, Bartleys and Dillingham entered into a new lease for the same retail space on August 30, 1974 (the 1974 Lease).[2] The 1974 Lease provided for a five-year term beginning on July 1, 1974, and terminating on June 30, 1979. Neither lease contained a right of renewal or option for renewal. Dillingham never promised or suggested that the 1974 Lease would be renewed.

On February 6, 1979, Dillingham orally informed Bartleys that the 1974 Lease would not be renewed despite Bartleys' request that Dillingham do so. The refusal to grant a new lease was confirmed in an April 2, 1979, writing which cited the fol-

---

1. These eight stores are located on Oahu at Kailua, on Bishop Street, at Pearlridge Shopping Center, at Ala Moana Shopping Center, at Kam Shopping Center, at Salt Lake Shopping Center, and at University Square; and on Maui at Maui Mall.

2. Article II of the 1974 Lease contains the following sections pertaining to minimum and percentage rent:

    Section 3.01. *Minimum Rent.* For each and every calendar month during the term of this lease commencing on the first day of July, 1974, Tenant shall pay to Landlord, on or before the first day of each month, at Landlord's office, the minimum rent of TWO THOUSAND THREE HUNDRED THIRTEEN DOLLARS AND NO/100 ($2,313.00) per month.

    . . . .

    Section 3.02. *Percentage Rent.* For each and every calendar month or fraction thereof during the term of this lease, Tenant shall pay to Landlord on or before the 10th day of the next succeeding month as additional rent a sum of money determined by deducting the minimum monthly or fractional monthly rent from the percentage rent for such preceding calendar month or fractional month. The percentage rent shall be determined as follows:

    Seven percent (7%) of all gross sales.

lowing reasons for the decision: (1) Bartleys' dollar sales volume growth did not keep pace with inflation in 1977 and 1978; (2) Bartleys failed to keep pace with the growth of its women's wear merchandise category and with the overall growth of Ala Moana since 1976; and (3) Bartleys' gross sales had decreased by 5.3 percent in 1978. The April 2, 1979, letter also extended the 1974 Lease on a month-to-month basis for two months.[3] Bartleys vacated the premises on August 31, 1979.

Bartleys opened a second store at Ala Moana called Susie's in 1971. Susie's lease at Ala Moana expired in February 1981, and was renewed for a one-year term.

Count I of the complaint alleges that Dillingham because of its status as sole owner of Ala Moana is a "monopoly and possesses the power and derives the profits of a monopolist in respect to such [retail space leasing, and operating and managing a retail shopping center] business at Ala Moana Center." Count I further alleges that Dillingham's lease agreements contain provisions which have as their purpose or effect the "fixing, directing, controlling, maintaining, and/or influencing of retail prices. . . ." in violation of section 1 of the Sherman Act.

Counts II, III, and IV of the complaint allege different variants of the section 1 claim. Count II alleges that Bartleys became a competitor of Dillingham when Bartleys opened a store at the Pearlridge Shopping Center in August 1978, and that

3. The April 2, 1979, letter from Dillingham to Bartleys states in full:

Dear Messrs. Bartley:

Thank you for meeting with Josie Bidgood, Alice Guild and me on various occasions to discuss the Bartley's [sic] Town and Country lease.

As we explained to you in our meetings, a decision not to renew a lease is the result of lengthy and careful consideration on the part of the management of Ala Moana Center. We always regret having to reach such a decision, and certainly this is true in Bartley's [sic] case.

As Doug Miki discussed with you last spring, competition in the marketplace will always be a factor with which business people must deal. We can appreciate your frustration in no longer being able to obtain exclusive representation of certain lines. This is a trade regulation, however, by which all suppliers and retailers must abide and we believe can be effectively dealt with by identifying other means of attracting customers, such as, offering better customer service or identifying unique marketing and merchandising methods.

Unfortunately, Bartley's [sic] has not kept pace with the growth of its merchandise category or the Center since 1976. While Ala Moana Center had an increase in 1978 of nearly 14 percent, Bartley's [sic] sales decreased by 5.3 percent. A copy of Bartley's [sic] 5-year sales history is attached.

In response to your observation that due to Bartley's [sic] volume, significant percentage gains should not be expected, we cite the fact that Ala Moana's sales base at the end of 1977 was $285 million, yet the Center enjoyed an increase of approximately $40 million in 1978. This substantial growth was achieved through an aggressive marketing program and the diligent efforts of most of our merchants, in spite of increased competition from new developments in Waikiki, and the continued growth and improvement of other shopping complexes on Oahu.

You mentioned in our conversation, and your letter of May 26, 1978 to Doug Miki, that Bartley's [sic] had a "hard nut to crack" following its performance in 1976. We believe it is not unreasonable to expect a retailer's sales growth to at least keep pace with inflation, which Bartley's [sic] did not do in 1977 or 1978. In fact, the sales decrease in 1978 is even more significant when the loss is measured against the rate of inflation.

In both of Doug's letters to you last year, he expressed the staff's concern at the sales trend of Bartley's [sic] and both times encouraged you to seek our assistance, which you elected not to do. We would like to reiterate that, while we are available and willing to spend time with merchants, we respect their right to decline our offer of assistance.

We hope that you will give consideration to our comments and consider applying them constructively toward a substantial improvement in the performance of your Susie's store. Again, if we can be of any assistance to you in regard to Susie's, please feel free to call upon any member of the management staff.

Pursuant to our earlier discussions, we would like to confirm our agreement to extend your tenancy on a month-to-month basis until August 31, 1979 when the lease expires on June 30, 1979. The provisions of Section 27.03 of the lease agreement shall govern this two-month holding over period.

Dillingham used the lease renewal refusal to exclude a competitor from, and reduce competition at, Ala Moana. Count III alleges that Dillingham's refusal to renew the lease was for the purpose of maintaining its monopoly position in the marketing and managing of retail space, and of extending its monopoly power into and over retail sales of goods and services, at Ala Moana. Count IV alleges that Dillingham used its leasing power to control pricing, marketing and business practices of its lessees, and that enforcement of such lease terms is a contract in restraint of trade.

Counts V and VI allege monopolization in violation of section 2 of the Sherman Act. Count V alleges that Dillingham monopolized and attempted to monopolize one or more of four markets: (1) retail sale of women's wear at Ala Moana; (2) retail shopping center trade at Ala Moana; (3) retail sale of women's wear in shopping centers on Oahu; and (4) retail shopping center trade on Oahu. Count VI repeats the allegations that Dillingham has a monopoly in leasing retail space at Ala Moana and has used this monopoly position as a leverage to monopolize or to attempt to monopolize the retail shopping center market at Ala Moana.

Count VII alleges that Dillingham's refusal to renew Bartleys' lease violates section 3 of the Clayton Act, 15 U.S.C. § 14.

Counts VIII, IX, X, XI and XII allege the following violations of Hawaii State antitrust law: Count VIII, Haw.Rev.Stat. § 480–4 (conspiracy in restraint of trade); Count IX, Haw.Rev.Stat. § 480–6 (refusal to deal); Counts X and XI, Haw.Rev.Stat. § 480–9 (monopolization); and Count XII, Haw.Rev.Stat. § 480–2 (unfair competition).

### III. Motion to Dismiss

Dillingham moves this Court pursuant to Fed.R.Civ.P. 12 for an order dismissing Bartleys' complaint on the grounds that this Court lacks subject matter jurisdiction and that the complaint fails to state claims upon which relief can be granted. In the alternative, Dillingham also moves pursuant to Fed.R.Civ.P. 56 for an order granting Summary Judgment in its favor on the grounds that there is no genuine issue of any material fact and Dillingham is entitled to judgment as a matter of law.

By its motion to dismiss, Dillingham seeks to test the legal sufficiency of Bartleys' complaint. A complaint should not be dismissed for insufficiency "unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." 2A MOORE'S FEDERAL PRACTICE ¶ 12.-08, at 2274 (2d ed. 1980) (citing DeLoach v. Crowley's, Inc., 128 F.2d 378, 380 (5th Cir. 1942)); McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) ("It is axiomatic that a complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "). Pleadings are to be liberally construed, and well-pleaded material allegations of the complaint are taken as admitted for purposes of the motion. Bartleys' complaint will survive a motion to dismiss if there is any theory of antitrust law that will support its claim.

For the reasons set forth below Dillingham's motion to dismiss is DENIED in part and GRANTED in part.

### IV. Section 1 Claims

█ In order to demonstrate that an act constitutes a violation of section 1,[4] three elements of a contract, combination or conspiracy must be shown: (1) it must be a joint action involving at least two actors; (2) it must unreasonably restrain trade or commerce; and (3) it must affect interstate or foreign commerce.

---

4. 15 U.S.C. § 1 provides:

Every contract, combination, in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or foreign nations is declared to be illegal.

A.  Price Fixing

Agreements to fix prices have long been condemned under section 1 of the Sherman Act.  *See United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

The threshold question before this Court as to the section 1 claims is whether the volume requirement imposed by Dillingham, that sales keep pace with inflation, is an unreasonable form of price fixing and thus a restraint of trade.

Bartleys alleges a system of percentage rent lease agreements between Dillingham and the retailers at Ala Moana, including Bartleys, and that Dillingham uses these leases coercively against the retailers to enforce a center-wide program to cause retail volume to increase.  Bartleys further alleges that the purpose and effect of the program is to influence retail pricing at Ala Moana, and that the threat of nonrenewal and actual nonrenewal of the lease agreements amounts to an illegal program to influence retail pricing at Ala Moana. Bartleys also alleges that Dillingham's enforcement of this program results in the elimination from competition of those retailers who compete with Dillingham. Bartleys asserts that immediately after the main store was terminated it began to manage and has since managed Susie's so that its volume has kept pace with inflation solely to avoid the nonrenewal of Susie's lease.

The Supreme Court has stressed that the Sherman Act's prohibition of price fixing extends to virtually all agreements limiting free, competitive pricing behavior. In *Socony-Vacuum, supra*, 310 U.S. at 221, 60 S.Ct. at 843, the Supreme Court stated:

Any combination which tampers with price structure is engaged in an unlawful activity.  Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces.  The act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference.

And at page 223, 60 S.Ct. at page 844:

Under the Sherman Act a combination performed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the prices of a commodity in interstate or foreign commerce is illegal *per se.*

It does not help defendants in a Sherman Act prosecution that their arrangements do not engender identical prices.  Illegal price "tampering" includes such situations; and this appears clearly from the court's explanation in *Socony-Vacuum* at page 222, 60 S.Ct. at page 843:

Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible.  Price fixing as used in the Trenton Potteries case [*United States v. Trenton Potteries Co.*, 273 U.S. 392 [47 S.Ct. 377, 71 L.Ed. 700] (1927)] has no such limited meaning . . . hence, prices are fixed within the meaning of the Trenton Potteries case if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices.  They are fixed because they are agreed upon.

■ The test for illegal pricing agreements is not what the actual effect is on prices, but whether such agreements interfere with "the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Plymouth Dealers' Association of Northern California v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (*quoting Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219). *See also Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1142 (9th Cir. 1974) ("The

crux of any price-fixing agreement is the relinquishment by a trader . . . of the freedom to set prices in accordance with his own judgment."); *Gray v. Shell Oil Co.*, 469 F.2d 742, 747–48 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973).

■ The existence of some price competition does not excuse an agreement among competitors to limit or control any aspect of price competition. In *Plymouth Dealers' Association, supra*, the Ninth Circuit held that it was unlawful for an association to publish and circulate to its members a uniform "list" price for Plymouth cars even though the cars were actually sold at varying prices. The court stressed that despite some price competition, as a matter of actual practice, the agreement established "one boundary of 'the range within which . . . sales would be made' ", and that "this was 'a factor which prevents the determination of [market] prices by free competition alone.' " *Id.* at 134 (*quoting Socony-Vacuum Oil Co., supra*, 310 U.S. at 222–23, 60 S.Ct. at 843–844). *Accord United States v. Gasoline Retailers Association, Inc.*, 285 F.2d 688 (7th Cir. 1961) (notwithstanding price competition, a gasoline station operators' agreement not to advertise price reductions was an illegal attempt to stabilize retail prices.)

In the case at bar, Bartleys alleges that Dillingham has directed a marketing plan at Ala Moana calculated to have a specific result throughout the retail level, *i.e.*, that retailers achieve volume growth which at least keeps pace with inflation. Dillingham warned Bartleys and Susie's twice in 1978 about their sales activities. Then, because Bartleys failed to change its sales practices, Dillingham, in early 1979, refused to renew Bartleys' lease. At the same time it terminated Bartleys, Dillingham pointedly threatened that Susie's would be terminated if it did not change its operations. Since then, Bartleys alleges that it has brought Susie's into compliance by shifting to higher priced inventory and by manipulating prices to turn inventory over faster.

Bartleys relies on *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) for support of its section 1 liability theory. In *Simpson* the plaintiff alleged that Union Oil refused to renew his service station lease solely because he sold gasoline below the price fixed by Union. The Supreme Court, in reversing a summary judgment for Union held that:

There is an actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market; and it matters not that the complainant may be only one merchant. . . . The fact that, on failure to renew a lease, another dealer takes Simpson's place and renders the same service to the public is no more an answer here than it was in *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473 [82 S.Ct. 486, 491, 7 L.Ed.2d 458]. For Congress, not the oil distributor, is the arbiter of the public interest; and Congress has closely patrolled price fixing whether effected through resale price maintenance agreements or otherwise. The exclusive requirements contracts struck down in *Standard Oil Co. v. United States*, 337 U.S. 293 [69 S.Ct. 1051, 93 L.Ed. 1371], were not saved because dealers need not have agreed to them, but could have gone elsewhere. If that were a defense, a supplier could regiment thousands of otherwise competitive dealers in resale price maintenance programs merely by fear of nonrenewal of short-term leases.

377 U.S. at 16–17, 84 S.Ct. at 1054.

This Court, having reviewed the applicable law in this area, and the allegations contained in the complaint in the light most favorable to Bartleys, finds that the allegations are sufficient to allege an injury to competition. Dillingham's volume requirement has had some effect on the price ranges of merchandise sold at Ala Moana, and this may pose a major anticompetitive threat. Bartleys has alleged that the volume requirement forces Susie's to manipulate its prices. The exact manner in which prices have been affected is a question which must ultimately be decided at trial.

### B. Concerted Activity

In order for Bartleys to succeed on its section 1 theory of liability, it must necessarily establish that Dillingham either combined or conspired in restraint of trade within the meaning of the Act. Dillingham argues that this case cannot be distinguished from a simple unilateral refusal to deal which was condoned in *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). This Court finds that the Colgate Doctrine is not applicable to the facts of this case.

In *Colgate*, a comprehensive resale price maintenance program allowed Colgate & Co. to sell its soap and toilet articles at uniform prices throughout the nation. According to the indictment obtained pursuant to section 1 of the Sherman Act, Colgate had gained adherence to its resale price schedules through:

> Distribution among dealers of letters, telegrams, circulars and lists showing uniform prices to be charged; urging them to adhere to such prices and notices, stating that no sales would be made to those who did not; requests, often complied with, for information concerning dealers who had departed from specified prices; investigation and discovery of those not adhering thereto and placing their names upon "suspended lists"; requests to offending dealers for assurances and promises of future adherence to prices, which were often given; uniform refusals to sell to any who failed to give the same; sales to those who did; similar assurances and promises required of, and given by, other dealers followed by sales to them; unrestricted sales to dealers with established accounts who had observed specified prices, etc.

The district court focused on the absence of contractual agreements and sustained Colgate's demurrer. Without a legal duty to abide by the price schedules, each buyer was free to set his own prices, although at the substantial risk of "incur[ring] the manufacturer's displeasure." The trial court held that the actions taken by Colgate to assure resale price maintenance were individual actions toward each buyer and went no further than the "undoubted right to decline further to deal with such person."

The Supreme Court then affirmed the district court because:

> In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.... A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade. [citations omitted] In *Dr. Miles Medical Co. v. Park & Sons Co., supra*, [220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911)] the unlawful combination was effected through contracts which undertook to prevent dealers from freely exercising the right to sell.

*Id.* at 307–8, 39 S.Ct. at 468.

*Colgate* has been modified when the seller obtains third-party cooperation in policing its policies or when a refusal to deal appears to be part of a broader campaign of monopolization. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). The general principle established in *Colgate* is that a businessman is free, absent monopolistic purpose, to refuse to deal with any present or potential supplier or customer. *Cf. United States v. Parke, Davis & Co., supra*. The *Parke, Davis* case made it clear, however, that there are important limitations imposed upon this right. Specifically, an ostensibly "unilateral" act will be treated as an antitrust violation if it is taken in furtherance of a scheme that constitutes an antitrust combination or conspiracy.

The court in *Parke, Davis* held that when a businessman goes beyond the mere announcement of a pricing policy and refuses

to deal with those who do not abide by the policy, and employs additional means to bring about adherence to his pricing policy, the element of concerted action may be inferred. *Id.* 362 U.S. at 47, 80 S.Ct. at 513.

■ The manufacturer or businessman is theoretically free to refuse to deal with price cutters, absent any purpose to restrain trade or create or maintain a monopoly, but compromises his freedom if he does not limit himself to a mere announcement of such refusal but takes further action to enforce this suggestion. *See Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

■ A refusal to deal may be a unilateral act insofar as the terminated customer or supplier may be concerned, but when it is exercised in furtherance of an unlawful price-fixing plan, the terminated party may have a cause of action. *See Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). Bartleys alleges that the acquiescence of the other retailers at Ala Moana in Dillingham's policy, be it voluntary or involuntary, satisfies the collaboration requirement of section 1. This Court agrees.

■ Dillingham instituted a policy and communicated it to the other retailers at Ala Moana by means of the nonrenewal of Bartleys' lease. Elimination of a nonconforming dealer notifies all other dealers that adherence to the supplier's resale price will be enforced. A combination may be inferred between dealers and a supplier based upon the dealers' acquiescence secured by threats of a termination of dealing. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 805 (9th Cir. 1976); *Phillips v. Crown Central Petroleum Corp.*, 395 F.Supp. 735, 760 (D.Md.1975) ("if a retailer unwillingly complies with a wholesaler's suggested or recommended price, he may properly claim that an illegal combination exists under Section 1 of the Sherman Act."); *Osborn v. Sinclair Refining Co.*, 286

F.2d 832 (4th Cir. 1961). Dillingham allegedly proceeded to secure compliance to its announced policy through coercive or threatening means. The other retailers, including at least Susie's, allegedly acquiesced in this policy. The element of combination has therefore been met.[5]

■ This Court recognizes that "[i]t is not sufficient to merely allege acquiescence and thus claim a combination has been demonstrated." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 289 (5th Cir. 1978). The Court must look at what the parties actually did rather than the words they used, and this requires the Court to look at the totality of circumstances which induced the alleged acquiescence after the policy announcement. Acquiescence "based solely on the individual self-interest of the customer in continued dealings with the manufacturer is not an agreement within the reach of the Sherman Act." *Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d 874, 879 (1st Cir. 1966).

> This is true even though it is recognized that there is no difference in economic effect between adherence to a manufacturer's policy effected by prohibited agreement and adherence effected by conduct within the narrow safety zone offered by *Colgate.*

*Id.*

Bartleys alleges that it is being punished for loss of volume at Ala Moana caused by Bartleys' opening a store in a competing shopping center. Strict compliance with Dillingham's minimum volume requirement would discourage retailers at Ala Moana from expanding their operations to other shopping centers because of the fear that gross sales at Ala Moana may drop. This allegation is sufficient to rebut the claim that the acquiescing retailers are simply acting in their own self-interest.

C.  Interstate Commerce

■ Section 1 of the Sherman Act prohibits every contract, combination or con-

---

5. The fact that Bartleys and Susie's are members of the combination is immaterial. The doctrine of *in pari delicto* is not a bar to Bart-

leys' claims. *See Perma Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

spiracy "in restraint of trade or commerce among the several states." The interstate commerce requirement is therefore a prerequisite to subject matter jurisdiction under section 1. To satisfy the jurisdictional element, the alleged illegal conduct must constitute either (1) activities that are "in" or "in the flow" of interstate commerce or (2) activities which though occurring purely on a local level substantially affect interstate commerce. *See McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980); *Thornhill Publishing Co., Inc. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 737 (9th Cir. 1979); *Harold Friedman, Inc. v. Thorofare Market, Inc.*, 587 F.2d 128 (3d Cir. 1978).

■ Dillingham asserts that Bartleys' allegations are not sufficient to meet the interstate commerce requirement of the federal antitrust laws. Dillingham argues that Bartleys' sole factual allegation that Bartleys and other lessees of Dillingham sell goods which are purchased and shipped from out-of-state in interstate commerce, is patently insufficient to establish this Court's jurisdiction. According to Dillingham, "the mere fact, standing alone, that a shopping center lessee sells goods which he has purchased at wholesale from another state is not sufficient to establish a substantial nexus with interstate commerce."

Dillingham relies upon *St. Anthony-Minneapolis, Inc. v. Red Owl Stores, Inc.*, 316 F.Supp. 1045 (D.Minn.1970) and *Savon Gas Stations Number Six, Inc. v. Shell Oil Co.*, 203 F.Supp. 529 (D.Md.1962), *aff'd*, 309 F.2d 306 (4th Cir. 1962), *cert. denied*, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963). These cases, which deal with restrictive covenants in leases, held that an essentially local activity should not be characterized as an interstate enterprise merely because it entails the sale of products that originate out of state. In relying on these cases Dillingham has overlooked the more recent statements by the Supreme Court and the Ninth Circuit regarding the test for determining substantiality of effect on interstate commerce.

In *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 741, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976), plaintiff's allegation that it "purchase[d] a substantial portion—up to 80%—of its medicines and supplies from out-of-state sellers" and in a single year had spent $112,000 on such items was considered sufficient to withstand a Rule 12(b)(6) motion to dismiss. Among the factors considered by the court in determining that a particular activity had a substantial effect on interstate commerce are whether the defendant purchases out-of-state supplies, whether the defendant is patronized by out-of-state customers, whether revenues come from out-of-state, and whether the defendant is financed by interstate companies.

In *McLain v. Real Estate Board of New Orleans, supra*, the Supreme Court reversed the dismissal of a section 1 complaint. The district court held that Respondents' real estate broker activities were purely local in nature. The Supreme Court said:

It is clear, as the record shows, that the function of respondent real estate brokers is to bring the buyer and seller together on agreeable terms. For this service the broker charges a fee generally calculated as a percentage of the sale price. Brokerage activities necessarily affect both the frequency and the terms of residential sales transactions. Ultimately, whatever stimulates or retards the volume of residential sales, or has an impact on the purchase price, affects the demand for financing and title insurance, those two commercial activities that on this record are shown to have occurred in interstate commerce. Where, as here, the services of respondent real estate brokers are often employed in transactions in the relevant market, petitioners at trial may be able to show that respondents' activities have a not insubstantial effect on interstate commerce.

100 S.Ct. at 511.[6]

■ The jurisdictional scope of the Sherman Act is coextensive with that of the

---

**6.** For Ninth Circuit cases supporting the ration-

al of *McLain* and *Hospital Building see Com-*

commerce power. *See Hospital Building Co. v. Trustees of Rex Hospital, supra,* 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338; *United States v. Employing Plasterer's Association,* 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954); *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 558–59, 64 S.Ct. 1162, 1176–1177, 88 L.Ed. 1440 (1944).[7] The commerce power has a very broad reach. In *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) a restaurant's annual purchase of approximately $70,000 of meat from a local supplier who had procured it from an out-of-state source was sufficient to invoke the commerce clause. In *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1972), the Supreme Court held that Congress had the power to limit the amount of wheat that farmers may grow in their own fields for their own consumption because the cumulative effect of the farmers' activities would reduce the interstate demand for wheat.

Bartleys alleges in its complaint that the goods sold at Ala Moana were purchased in interstate commerce. Bartleys alleges that its own interstate purchases and sales amounted to approximately $1,000,000 a year. In depositions, Bartleys indicates that much of its business caters to tourists. These allegations are sufficient to establish that there is not an insubstantial movement of goods in interstate commerce. Bartleys' interstate transactions are terminated by Dillingham's nonrenewal of Bartleys' lease. Therefore, Dillingham's activities have the necessary affect on interstate commerce to invoke section 1 jurisdiction.

In summary, Bartleys' allegations are sufficient to state a prima facie case for a section 1 violation. Accordingly, Dillingham's motion to dismiss all claims relating to section 1 is DENIED.

V. Section 2 Claims

A. Monopolization

Bartleys' monopolization claims are based on the allegation that Dillingham possesses monopoly power in the relevant market of leasing retail space at Ala Moana. Bartleys maintains that Dillingham abused its "first level" monopoly power over retail space at Ala Moana to control and to exert leverage over a "second level" market consisting of the retail market for consumer goods and services.

■ The offense of monopolization under section 2 of the Sherman Act[8] has three elements: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident; and (3) an activity in or affecting interstate commerce.[9] *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ In support of its monopolization theory, Bartleys relies upon *Gamco v. Providence Fruit & Produce Building, Inc.,* 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952). *Gamco* involved a building adjacent to a railroad freight line in Providence, Rhode Island, which was designed to provide selling, storage, and shipping facilities for the city's

---

*munity Builders, Inc. v. City of Phoenix,* 652 F.2d 823 (9th Cir. 1981); *Western Waste Service v. Universal Waste Control,* 616 F.2d 1094 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).

**7.** *See also Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 194–95, 95 S.Ct. 392, 397–399, 42 L.Ed.2d 378 (1974); *United States v. Frankfort Distilleries, Inc.,* 324 U.S. 293, 298, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940); *Atlantic Cleaners & Dyers,*

*Inc. v. United States,* 286 U.S. 427, 435, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932).

**8.** 15 U.S.C. § 2 broadly states:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, among the several states . . . shall be deemed guilty of a felony . . . .

**9.** The interstate commerce requirement has been discussed under Part IV of this opinion.

fresh fruit and vegetable wholesalers. Gamco was a lessee in the building, which was indisputably the center of local trade. Retail buyers habitually congregated there, and the shipping facilities were the best in Providence. Practically all fruit and vegetable dealers in the area at one time or another held leases or stock in the building corporation.

When Gamco, for business reasons, was forced to ally itself with a Boston wholesaler, the building corporation refused to renew the lease. Gamco argued that the nonrenewal of the lease was motivated by the desire to exclude out-of-state wholesalers, and sought an injunction against the building owners for violations of sections 1 and 2 of the Sherman Act.

In a comment particularly relevant to the present case, the court said that

> [a]dmittedly the finite limitations of the building itself thrust monopoly power upon the defendants, and they are not required to do the impossible in accepting indiscriminately all who would apply. Reasonable criteria of selection, therefore, such as lack of available space, financial unsoundness, or possibly low business or ethical standards, would not violate the standards of the Sherman Antitrust Act. But the latent monopolist must justify the exclusion of a competitor from a market which he controls.

The court held that since defendants had both the power and the motive to exclude, a prima facie case of monopolization was made out by an exclusion without apparent reason. It was therefore incumbent upon the defendants to come forward with a business justification for their actions. *Id.* at 488–89. Although the defendants maintained that alternative selling sites were available, the court also noted that

> a monopolized resource seldom lacks substitutes; alternatives will not excuse monopolization.... To impose upon plaintiff the additional expenses of developing another site, attracting buyers, and transshipping his fruit and produce by truck is clearly to extract a monopolist's advantage.

As *Gamco* suggests, a prima facie case of anticompetitive exclusion can be established by a showing that the excluded store is a potential competitor. Under *Gamco*, exclusion due to space limitations or the prospective tenant's fraudulent business practices would not be considered an antitrust violation. However, the selection process should not be permitted to turn on anticompetitive criteria.

Bartleys alleges that Dillingham is a competitor by virtue of the percentage rent leases to retailers. Under these leases, Dillingham takes a percentage of the dollar volume of each retailer's sales in the retail market. The higher the volume, the greater the percentage rents and profits for Dillingham. Bartleys alleges that immediately after it opened a new store at the Pearlridge Shopping Center, its volume at Ala Moana began to decline. In 1978 Bartleys' volume at Ala Moana fell by about 5% although the aggregate volume of all nine of its stores increased by about 7%. According to Bartleys, the Pearlridge store had the effect of taking away sales from its Ala Moana store. This resulted in a corresponding decrease in the percentage rents to Dillingham. In essence, then, Bartleys alleges that Dillingham exploited its position of dominance as a landlord by excluding a competitor for no apparent legitimate reason.

Bartleys has stated a prima facie case for monopolization under the *Gamco* criteria. Dillingham had both the power to exclude and a motive to exclude Bartleys as a possible competitor. Accordingly, Dillingham's motion to dismiss as to the section 2 monopolization claim is DENIED.

### B. Attempt to Monopolize Claims

The "attempt to monopolize" provision includes activities embodying "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

■ The elements required to prove or establish an "attempt to monopolize" include: (1) predatory conduct or anticompetitive conduct directed to accomplishing the unlawful purpose; (2) a dangerous probability of success; (3) specific intent to control prices or destroy competition with respect to a part of commerce; and (4) antitrust injury. *California Computer Products, Inc. v. International Business Machines*, 613 F.2d 727, 729 (9th Cir. 1979); *Island Tobacco Co., Ltd. v. R. J. Reynolds Industries, Inc.*, 513 F.Supp. 726 (D.Haw.1981); *Robert's Waikiki U-Drive v. Budget Rent-A-Car*, 491 F.Supp. 1199 (D.Hawaii 1980); *Foremost International Tours, Inc. v. Quantas Airways Ltd.*, 478 F.Supp. 589 (D.Hawaii 1979).

■ Bartleys alleges that Dillingham violated section 2 of the Sherman Act by attempting to monopolize either the women's wear retail market or the retail shopping center market at Ala Moana and on the island of Oahu, Hawaii. Bartleys has made no allegations concerning Dillingham's market dominance in these relevant market areas, nor has Bartleys made allegations that Dillingham's activities in these markets constitute such a substantial restraint of trade as to create a dangerous probability of success of monopolization.

In *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946), the Supreme Court approved the following definition of "attempt to monopolize," which included the element of "dangerous probability":

"The phrase 'attempt to monopolize' means the employment ᵥ of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short nevertheless approach so close as to create a dangerous probability of it, which methods, means and practices are so employed by the members of and pursuant to a combination or conspiracy formed for the purpose of such accomplishment."

Although the possibility of actual monopolization need not be shown, *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), some showing of potential monopoly power in the relevant market must be demonstrated. "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). "[S]ize is of course an earmark of monopoly power," *United States v. Griffith*, 334 U.S. 100, 107, n.10, 68 S.Ct. 941, 946 n.10, 92 L.Ed. 1236 (1948), and "[t]he existence of such power ordinarily may be inferred from the predominant share of the market." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

Dillingham is not in the business of retailing women's wear, and cannot be accused therefore of an attempt to monopolize a market in which it does not compete. As to the claim that Dillingham has attempted to monopolize the retail shopping center market on Oahu, Bartleys has not demonstrated that Dillingham has any sizeable degree of market share and hence monopoly power to support a finding of a dangerous probability of success in the attempt to monopolize the retail shopping center market. This is true even if Bartleys were able to demonstrate Dillingham's specific intent to monopolize the retail shopping center market. As this Court stated in *Wisdom Rubber Industries, Inc. v. Johns-Manville Sales Corp.*, 415 F.Supp. 363, 368 (D.Haw.1976), "intent, without some probability of success, is mere wishful thinking. . . ."

Dillingham's motion to dismiss as to the attempt to monopolize claims is GRANTED.

VI. Clayton Act Claims

■ Count VII of the Complaint alleges that Dillingham's refusal to renew Bartleys' lease is a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.[10]

10. Section 3 of the Clayton Act as codified in 15 U.S.C. § 14 states in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such com-

Section 3 prohibits discrimination only in the lease or sale of "commodities." The language of the Act indicates that "commodity" means tangible, physical, movable articles of commerce. It uses the word "commodities" almost interchangeably with words such as "goods," "wares," or "merchandise." The rule of *ejusdem generis* requires that the meaning of "commodities" be confined to articles of the same kind, class, and character as those specifically enumerated.

The courts have consistently confined application of the Act to tangibles. The Act does not apply to leases of realty. *See Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251 (6th Cir. 1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 251 (1971); *Plum Tree, Inc. v. N. K. Winston Corp.*, 351 F.Supp. 80 (S.D.N.Y. 1972); *Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town & Country Shopping Center, Inc.*, 219 F.Supp. 400 (W.D.Pa.1963).

Dillingham's motion to dismiss Count VII and all claims involving a violation of the Clayton Act is GRANTED.

## VII. State Claims

Counts VIII, IX, X, XI and XII allege the following violations of state antitrust law: Haw.Rev.Stat. §§ 480–4,[11] 480–6,[12] 480–9,[13]

and 480–2.[14] The Hawaii Supreme Court has recently announced that state antitrust laws are to be construed in accordance with judicial interpretations of similar federal antitrust statutes. *Island Tobacco Co., Ltd. v. R. J. Reynolds Tobacco Co.*, 63 Haw. —— (1981), 627 P.2d 260 (1981).

Accordingly, the following claims are disposed of in accordance with this Court's decision above. Dillingham's motion to dismiss claims arising under Haw.Rev.Stat. §§ 480–2 and 480–6 is DENIED. Dillingham's motion to dismiss claims arising under Haw.Rev.Stat. § 480–9, insofar as the claim relates to monopolization is DENIED. Insofar as the claims under § 480–9 relate to an attempt to monopolize violation, Dillingham's motion to dismiss is GRANTED.

Haw.Rev.Stat. § 480–2 prohibits unfair methods of competition. In interpreting Haw.Rev.Stat. § 480–2, this Court is guided by section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45,[15] as mandated by Haw.Rev.Stat. § 480–3 which states:

> *Interpretation.* It is the intent of the legislature that in construing Section 480–2 the courts will be guided by the interpretation given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act.

---

merce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

11. Haw.Rev.Stat. § 480–4 states in relevant part:
    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal.

12. Haw.Rev.Stat. § 480–6 states in full:

No person shall refuse to sell any commodity to or to buy any commodity from, any other person or persons, when the refusal is for the purpose of compelling or inducing the other person or persons to agree to engage in acts which, if acceded to, are prohibited by other sections of this chapter.

13. Haw.Rev.Stat. § 480–9 states in full:
    No person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State.

14. Haw.Rev.Stat. § 480–2 states in full:
    Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

15. 15 U.S.C. § 45 states in pertinent part:
    Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

**514**

Under section 5 of the Federal Trade Commission Act, it is an unfair method of competition to violate any other specific trade regulation statute. Federal law also dictates that attempts to circumvent antitrust statutes are prohibited under the Act. *See Grand Union Co. v. F.T.C.,* 300 F.2d 92 (2d Cir. 1962). Unfair trade practices which violate the spirit of the antitrust laws fall within the purview of the Federal Trade Commission Act. *See Island Tobacco Co. v. R. J. Reynolds Industries, Inc., supra,* 513 F.Supp. 726.

Haw.Rev.Stat. § 480–2 differs from section 5(a)(1) of the Federal Trade Commission Act in that Hawaii's statute grants a private right of action whereas section 5(a)(1) contains no express private remedy. Section 480–2 is also designed to protect "competitors" as well as "competition." *See Island Tobacco Co. v. R. J. Reynolds Tobacco Co.,* 63 Haw. ——, 627 P.2d 260 (1981), *supra. See also Ai v. Frank Huff Agency, Ltd.,* 61 Haw. 607 P.2d 1304 (1980).

In *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), the Supreme Court considered the sweep of section 5 of the F.T.C. Act, 15 U.S.C. § 45 (1976):

> Thus, legislative and judicial authorities alike convince us that the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.

405 U.S. at 244, 92 S.Ct. at 905. The court approvingly cited the criteria used by the Commission in determining whether a particular practice offends public values:

> "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some commonlaw, statutory, or other established concept of unfair-

ness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed.Reg. 8355 (1964).

*Id.* As was additionally stated in *Spiegel, Inc. v. F.T.C.,* 540 F.2d 287, 293 (7th Cir. 1976):

> In determining whether Spiegel's challenged practices are unfair under Section 5 of the Act, the Commission remained faithful to its previously announced criteria. A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

In *Triangle Conduit & Cable Co. v. F.T.C.,* 168 F.2d 175 (7th Cir. 1948), the Seventh Circuit discussed the use of a base point pricing system as an unfair method of competition under section 5. The court in following the argument of the Federal Trade Commission noted that unfair methods of competition involved not only deception, bad faith, and fraud, but also methods that involved "oppression or such as are against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." *Id.* at 181. The court also noted that the major purpose of the Act was to restrain practices as unfair which, "although not yet having grown into Sherman Act dimensions would most likely do so if left unrestrained." *Id.* The court found that it was an unfair practice to deprive customers of the price advantage they would naturally have had were it not for the unreasonable restraints imposed by defendants.

Bartleys' allegations are sufficient to state causes of action under sections 1 and 2 of the Sherman Act. Bartleys' allegations are also sufficient to state a cause of action under section 5 of the Federal Trade Commission Act. *A fortiori,* Bartleys has stated a claim under Haw.Rev.Stat.

§ 480–2. Dillingham's motion to dismiss Count XII is therefore DENIED.

## VIII. CONCLUSION

Dillingham's Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction and for Failure to State a Claim upon which Relief can be Granted or, in the Alternative, for Summary Judgment is DENIED in part and GRANTED in part in accordance with this decision.

SO ORDERED.